

Retailer #: 241835
Cost Center #: 137711

## RETAIL SALES AGREEMENT

**THIS AGREEMENT** is effective June 1, 2003 ("Effective Date") between Motiva Enterprises LLC ("Seller") whose address is 12700 Northborough Drive, Houston, TX 77067, and LAKEVIEW AUTO CARE INC / LAKEVIEW AUTO CARE INC ("Retailer") whose address is 1050 WASHINGTON STREET, BRAINTREE, MA 02184.

This Agreement is comprised of two parts. PART I sets forth the variable provisions of this Agreement and references the applicable articles in PART II that sets forth the general provisions. To the extent there is a conflict between PART I and PART II, the provisions in PART I are controlling.

### PART I

**Special Legend for Retailers in Delaware and Maine:**

PRICE FIXING OR MANDATORY PRICES FOR ANY PRODUCTS COVERED IN THIS AGREEMENT IS PROHIBITED. A SERVICE STATION DEALER MAY SELL ANY PRODUCTS LISTED IN THIS AGREEMENT FOR A PRICE WHICH HE OR SHE ALONE MAY DECIDE.

**Special Legend for Retailers in Tennessee and Rhode Island:**

Nothing herein shall be construed to prohibit a franchisor from suggesting prices and counseling with franchisees concerning prices. Price fixing or mandatory prices for any products covered in this Agreement are prohibited. A service station dealer or wholesale distributor may sell any products listed in this Agreement for a price which such dealer or distributor alone may decide.

**Article No.**

1(c)        Designated brand Identification: SHELL

1(h)        Retailer's Station is located at: 1050 WASHINGTON STREET, City of BRAINTREE, County of NORFOLK, State of MASSACHUSETTS.

2        Product quantities:

### MINIMUM PRODUCT QUANTITIES
(in thousands of gallons)

| PRODUCT | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **GASOLINE** | 66 | 66 | 56 | 74 | 66 | 74 | 57 | 54 | 66 | 65 | 56 | 66 |
| **DIESEL** | | | | | | | | | | | | |

4        This Agreement begins on the Effective Date specified above and expires May 31, 2006 ("Expiration Date").

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

5    Motor Fuel Dispensing Station _x_ or Automotive Service Station __.

7(h)   **Except for Retailers in Delaware, District of Columbia, Massachusetts, and New Hampshire:**

     Hours of operation: 24 hours each day from 12:00 AM to 12:00 AM.

26(b)   Key Management Person designated for Retailer if Retailer is a Business Entity or joint Retailer MATTHEW D. HERMAN _____.

**NOTE TO RETAILER: BE SURE YOU READ AND UNDERSTAND ALL OF THE PROVISIONS OF PART I AND PART II OF THIS AGREEMENT BEFORE YOU SIGN BELOW.**

Executed on the date shown below.

LAKEVIEW AUTO CARE INC / LAKEVIEW AUTO CARE INC
**Retailer**

By: _____

Title: ____PRESIDENT_____

Date: ____5/8/03_____

Shell Oil Products US
On behalf of
Motiva Enterprises LLC
**Seller**

By: _____
   Allen Girndt
Title:  Manager Contracts

Date: _____6/10/03_____

**Rev 2002/10/24 (Ret053)**
Retail Sales Agreement

## PART II

1. **DEFINITIONS.** As used in this Agreement, the terms below have the following meanings, whether singular or plural:

(a)   "Alteration" – Any addition, modification, removal, or replacement of any building, improvement or equipment at Retailer's Station.

(b)   "Business Entity" – Any legal entity that is not an individual or sole proprietorship, including, without limitation, a partnership, corporation, limited liability company, limited liability partnership, or association.

(c)   "Identifications" – The trademarks, trade dress, service marks, and color schemes of the brand designated in PART I and licensed to Retailer by Seller for use by Retailer at Retailer's Station in connection with the resale of Products under the terms of this Agreement.

(d)   "Law" – Any applicable constitution, statute, ordinance, regulation, rule, administrative order, or other requirement of any federal, state, or local government agency or authority in effect at the time of execution, or during the term, of this Agreement.

(e)   "Products" – The gasoline and diesel sold to Retailer by Seller for resale under the brand Identification designated by Seller in PART I.

(f)   "Plant" – The distributing plant from which deliveries of Products are made to Retailer.

(g)   "PMPA" – The Petroleum Marketing Practices Act as may be amended from time to time (15 U.S.C. § 2801 et seq.).

(h)   "Retailer's Station" – The motor fuel dispensing station or automobile service station, as the case may be, and associated facilities located at the address identified in PART I and operated by Retailer under this Agreement for those authorized uses identified in Article 5.

2. **PURCHASE AND SALE OF PRODUCTS.**

(a)   Seller shall sell and deliver to Retailer and Retailer shall purchase and accept from Seller the minimum quantities of Products during each calendar month as identified in PART I ("Minimum Quantities"). Seller may, but is not obligated to, sell Retailer more than the Minimum Quantities. Seller may adjust the Minimum Quantities pursuant to any applicable Federal or state mandatory or voluntary allocation program or in accordance with Article 18. If Retailer fails to purchase the Minimum Quantities, Seller may, in its sole discretion, take such action as Seller deems appropriate including, without limitation, (1) adjusting the Minimum Quantities if the failure was due to changed circumstances; or (2) exercising Seller's right to terminate or nonrenew this Agreement under Article 22 unless such failure was due to a reason beyond Retailer's reasonable control.

(b)   This Article 2(b) is not applicable to retailers who lease Retailer's Station from Seller. Retailer acknowledges that Seller has made a substantial investment in Retailer's Station based on Retailer's commitment to purchase the Minimum Quantities from Seller over the term of the Agreement. In consideration for this substantial investment, if Retailer fails to purchase the Minimum Quantities from Seller over the term of this Agreement (whether due to Seller's termination or nonrenewal for cause or Retailer's termination prior to the expiration of this Agreement), upon Seller's written notice, Retailer shall immediately pay Seller the lost profits Seller would have received if Retailer had purchased the Minimum Quantities together with all incidental damages and costs paid by Seller to collect such damages. Retailer acknowledges that other remedies available to Seller are inadequate since they would not place Seller in as good of a position if Retailer fully performed the Agreement.

3. **PRICES AND TERMS OF PAYMENT.**

(a)   Retailer shall pay Seller for the Products the price in effect at the time loading commences at the Plant for the place of delivery. Retailer may ascertain Seller's current prices from Seller's computer based website or at such other place designated by Seller.

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

(b)    Retailer shall pay for the Products in accordance with Seller's payment terms in effect from time to time, any of which may be altered or revoked by Seller with reasonable notification to Retailer. If Seller elects to extend credit to Retailer, Retailer shall comply with Seller's credit terms in effect from time to time, any of which may be altered or revoked by Seller without prior notification to Retailer. Retailer shall make all payments to Seller via Seller's Electronic Fund Transfer ("EFT") system unless Seller, in its sole discretion requires Retailer to pay Seller via cashier's check at time of delivery or wire transfer of funds prior to time of delivery or at such other time and place or method as Seller may designate from time to time. Seller, as a condition of extending EFT terms may require, at its sole discretion, Retailer to:  (1) provide Seller with a cash deposit;  (2) provide Seller with an Irrevocable Bank Letter of Credit sufficient to Seller in form and amount; or (3) post other security or meet other conditions as may be determined by Seller. Retailer shall provide any written authorizations required for EFT purposes. If Seller requires Retailer to pay by cashier's check, Retailer shall pay a reasonable administration charge.  Upon Seller's request, Retailer shall provide Seller with information and documents relating to Retailer's financial condition and creditworthiness.

(c)    Seller may assess a reasonable administrative fee upon Retailer for payments that are returned or rejected for lack of sufficient funds or for any other reason within Retailer's control. All overdue sums owed to Seller will bear interest at the maximum lawful rate per annum from the date due until paid. Further, if Retailer fails to make timely payment of any amount due Seller, in addition to all other rights or remedies available, Seller may take such action as Seller deems reasonable under the circumstances. Without limiting the generality of the foregoing, Seller may setoff or equitably recoup against any amount then due Retailer, defer further deliveries of the Products until payment of all outstanding indebtedness is made, and demand advance cash payment for further deliveries. Retailer shall comply with the terms of any reclamation notice issued to Retailer by Seller under applicable Law.

4.    **TERM.**

(a)    The term of this Agreement is identified in PART I but is subject to Seller's termination and nonrenewal rights under Article 22. Neither party has any obligation to renew this Agreement, or of any extension of this Agreement agreed to in writing by the parties, or continue the relationship established hereunder beyond the term provided in this article except if required by Law. If by operation or effect of Law Seller is required to continue its relationship established under this Agreement with Retailer beyond the term specified in this article and the parties do not extend or renew this Agreement by written instrument, then the term of this Agreement will be extended on a month-to-month basis on the same terms and conditions of this Agreement for not more than 6 successive months, subject to (a) termination of this Agreement by either party during such extension period in accordance with the notice provisions of Article 28 or (b) nonrenewal by Seller at the end of any such month.

(b)    If Retailer does not lease Retailer's Station from Seller, prior to the Effective Date, at any time Retailer replaces any of its underground storage tanks ("UST"), and at all other reasonable times upon request, Retailer shall provide Seller a certification: (1) based on evidence satisfactory to Seller that the Underground Storage Tank ("UST") system is in compliance with applicable Laws; (2) of the integrity (leak free condition) of the UST system based on actual test results or other evidence satisfactory to Seller; and (3) of the manufacturer's actual capacity (not nominal capacity) as specified on an original tank chart as issued by the manufacturer.

5.    **USE AND FAILURE TO MAINTAIN PLACE OF BUSINESS.**

(a)    Retailer shall use Retailer's Station solely for the operation of a motor fuel dispensing station or, if approved by Seller in PART I, an automobile service station and those associated facilities for the uses authorized by Seller in Exhibit A. Retailer must obtain Seller's prior written consent to use Retailer's Station for any use not authorized under this article.

(b)    If approved by Seller for use as an automobile service station, Retailer's authorized use includes only minor repairs and services to motor vehicles.  For the purpose of this article, "minor repairs and services" excludes major repairs and replacements, including, but not limited to, (1) engine replacement or engine repair involving removal of the engine; (2) automatic transmission/transaxle replacement or repair and manual transmission/transaxle repair; and (3) differential assembly replacement or repair. Seller may modify this description of major repairs and services from time to time consistent with evolving industry practice and shall provide notice to Retailer of such modification.

(c)    Retailer shall maintain Retailer's Station in accordance with Seller's motor fuel station and associated facilities standards and specifications, established by Seller from time to time, including, but not limited to, those relating to architectural design, style, color scheme, and layout. If Seller changes these standards and specifications, Seller shall provide Retailer with notice.

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

(d)     Retailer shall maintain a sufficient amount of all grades of Products for resale at Retailer's Station.

**6.     PERMISSION TO USE THE IDENTIFICATIONS.**     Seller grants to Retailer permission to use the Identifications at Retailer's Station only in connection with the resale of the Products and so long as Retailer complies with the terms of this Agreement, including, without limitation, the following requirements relating to the marketing, storage, and resale of the Products.

(a)     Retailer shall strictly maintain the quality of all Products and shall not adulterate, commingle, or blend the Products with any other products or substances in any manner.

(b)     Retailer shall not resell gasoline or diesel at Retailer's Station other than gasoline or diesel purchased from Seller to be resold under the Identifications except to the extent Seller does not sell Shell-branded diesel in the market in which Retailer's Station is located.

(c)     Retailer shall clearly identify and correctly label all Products under their proper brand names, designations, and grades.

(d)     If Retailer purchases unbranded diesel fuel from Seller, or any other supplier, for resale at Retailer's Station, then adequate facilities must be maintained, and the unbranded diesel fuel must be correctly identified in accordance with Seller's specifications at Retailer's Station.

(e)     Retailer shall not use the word "Shell" or "Texaco" as part of Retailer's Business Entity name. Retailer shall not use the Identifications or the word "Shell" or "Texaco" in Retailer's trade style if the use is likely to: (1) create the impression that Retailer's business is owned or operated by Seller or (2) deceive or cause a likelihood of confusion to prospective customers.

(f)     All signs and other advertising devices or materials furnished by Seller to Retailer will remain Seller's property, must be used solely in connection with Retailer's sale of the Products, and must be returned to Seller immediately upon demand at Retailer's expense.

(g)     Retailer shall obtain Seller's prior written approval before using any promotional materials or advertising bearing any of the Identifications.

**7.     BRAND IDENTIFICATION AND MINIMUM STANDARDS.**     Retailer     acknowledges     that     the Identifications represent to the motoring public the manufacture and sale of quality Products. Retailer shall undertake no action of any kind that may harm or degrade the Identifications. Retailer further acknowledges that uniform standards of quality and appearance must be maintained at all stations displaying the Identifications in order to properly market and sell the Products, preserve and promote the reputation of Seller, and achieve public acceptance of the Products. Accordingly, Retailer shall comply with all standards of operation and appearance established from time to time by Seller, including, without limitation, the following minimum obligations; provided, however, the means and the manner of performance are within the sole discretion of Retailer:

(a)     Retailer shall diligently and efficiently merchandise and promote the Products at Retailer's Station. In merchandising the Products, Retailer shall fully consider using Seller's latest merchandising planning guidelines provided to Retailer from time to time.

(b)     Retailer acknowledges receipt of, or has been informed on how to access through Seller's online website, Seller's brand standards guidelines pertaining to Seller's image, operations, appearance, and cleanliness standards ("Brand Standards"). At all times during the term of this Agreement, Retailer shall maintain Retailer's Station in accordance with the Brand Standards, as may be amended by Seller from time to time. If Seller amends the Brand Standards, Seller shall provide Retailer notice.

(c)     Retailer shall personally and actively manage the business at Retailer's Station to assure good faith compliance with this Agreement.

(d)     Retailer shall conduct Retailer's operations at Retailer's Station in a professional and business-like manner and provide prompt, courteous, and efficient service to the public. Retailer shall promptly and courteously respond to any customer complaints (including written responses when appropriate) and take immediate action to satisfactorily resolve each customer

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

complaint. If, in Seller's sole judgment, Retailer fails to adequately respond to and resolve customer inquiries or complaints, Seller may do so at Retailer's expense.

(e)    In order to operate Retailer's Station in an organized and efficient manner, Retailer shall maintain adequate and competent personnel who are able to converse in English with Seller, Retailer's customers, government officials, and other persons, considering both the volume and nature of the business activity.

(f)    Retailer and Retailer's employees shall wear neat, clean uniforms and nametags of a type and style approved by Seller. Such approved uniforms must be purchased or rented from a vendor approved by Seller.

(g)    Retailer shall perform all authorized service work at Retailer's Station in a workmanlike manner utilizing only first-class new materials and parts except when the customer specifically authorizes rebuilt or used materials or parts.

(h)    Except for retailers in Delaware, Massachusetts, New Hampshire, and District of Columbia, Retailer shall keep Retailer's Station open as an attended station for the sale of Products (unless Retailer receives Seller's prior consent to keep open as an unattended station, which consent may be withheld consistent with applicable Law) during the hours and days of operation specified in PART I. Seller will adjust the hours of operation if required by Law.

(1)    Retailers in Delaware, Massachusetts, and New Hampshire: Retailer shall keep Retailer's Station open during such hours each day and days each week as is necessary to assure that Retailer diligently and efficiently merchandises and promotes the sale of the Products, having due regard to prior practice, competitors' current practice, vehicular traffic patterns, customer convenience, availability of Products, and other customary criteria followed by Seller.

(2)    Retailers in District of Columbia: Retailer shall keep Retailer's Station open during such hours each day and days each week as is necessary to assure that Retailer diligently and efficiently merchandises and promotes the sale of the Products, having due regard to prior practice, competitors' current practice, vehicular traffic patterns, customer convenience, availability of Products and other customary criteria followed by Seller. In no event shall Retailer allow Retailer's Station to be closed for more than 18 days during any calendar year.

(i)    Retailer shall not commit or permit any fraudulent or illegal act or activity at Retailer's Station or in connection with Retailer's performance under this Agreement.

(j)    Retailer shall not permit the consumption of intoxicating beverages or use of illegal drugs at Retailer's Station.

(k)    Retailer shall not keep animals at Retailer's Station.

(l)    Retailer shall keep Retailer's Station, and the signs located at Retailer's Station, fully illuminated during the hours of operation.

(m)    Except to the extent Seller may have expressly assumed responsibility under any separate agreement, Retailer shall maintain Retailer's Station in a clean, sanitary, and safe condition and all property and equipment in good operating condition and repair. Retailer shall keep the driveways, sidewalks, and other landscaped areas in a neat and orderly appearance free from weeds, debris, snow, ice, and rubbish. Retailer shall keep the restrooms cleaned and stocked with necessary supplies and available during operating hours.

(n)    Retailer shall not use Retailer's Station for any unlawful, offensive, hazardous, unsightly, or other objectionable purpose, including, but not limited to, the sale or display of materials with dominant themes of sex, nudity, prurient interest, or pornography. Retailer shall not display or offer for sale merchandise or paraphernalia that is morally offensive or distasteful to the general public.

(o)    Retailer shall keep Retailer's Station clear of vehicles, other mobile equipment, and obstructions that restrict traffic flow, endanger customer safety, or detract from appearance. Retailer may not use Retailer's Station to sell, lease, park, or store motor vehicles, trailers, boats, or other mobile equipment.

(p)    Retailer may display signs necessary to identify the Products and services offered and their prices provided the signs are displayed in a neat and orderly manner at Retailer's Station, are not affixed to the exterior of any building or the pole

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

support(s) for the main Identification sign(s), and are briefly worded, professional-looking, and not handwritten. Retailer shall not display or use any other signs, posters, flags, pennants, or other advertising devices without Seller's prior written approval. Signs bearing Seller's Identifications may only be purchased or rented from a vendor approved by Seller.

(q)    Retailer shall not install or replace any vending machine or equipment for merchandising sundry convenience items, or video or other game machine, without Seller's prior written consent.

(r)    Retailer shall keep Retailer's Station free from loitering by persons who have no proper business purpose at Retailer's Station.

(s)    Retailer shall operate and maintain Retailer's Station in a secure manner so that criminal activity is adequately deterred from occurring at Retailer's Station and all persons at Retailer's Station are adequately protected from injury, harm, or loss.

8.    **SELLER'S MARKETING RIGHTS.**    Seller may, from time to time: (a) change the Identification applicable to any Product and require Alterations, at Retailer's expense, in accordance therewith; (b) add, change, or modify the grade, brand name, delivery package, or other distinctive designation of any Product; (c) change or modify the formulations and specifications of any Products; and (d) discontinue at any time the sale of any Product in which event the parties will be relieved of any further obligation with respect to that Product.

9.    **TRAINING.**

(a)    Prior to the execution of this Agreement, Retailer or, if Retailer is a Business Entity, Retailer's Key Management Person shall attend and successfully complete Seller's initial retailer training course unless Seller expressly waives such requirement. Seller shall pay the costs associated with the initial training including costs for instructors, training materials, and the facility. Retailer shall arrange and pay for Retailer's or Retailer's Key Management Person's own transportation, lodging, and food.

(b)    After the initial training, Retailer or Retailer's Key Management Person shall successfully complete Seller's required computer based training courses 2 times per year and any additional required training, during the term of this Agreement. If applicable, Seller shall pay the costs associated with the additional required training including costs, if any, for instructors, training materials, and the facility. Retailer shall arrange and pay for Retailer's or Retailer's Key Management Person's own transportation, lodging, and food.

(c)    Retailer shall execute Seller's training agreement prior to attending any training course. Upon Seller's request, Retailer shall furnish proof of Retailer's orientation and training for automobile service station, motor fuel dispensing station, and convenience store employees. Retailer shall have available and utilize training equipment, materials, and programs made available by Seller from time to time for training purposes.

(d)    To enhance the expeditious meeting of safety, health, operational and customer needs, all training courses, programs, and tests offered by Seller will be given only in the English language.

10.    **NO EXCLUSIVE TERRITORY.** Nothing in this Agreement grants Retailer an exclusive territory to market and resell any Products. Seller reserves the right to market and sell, and authorize others to market and sell, Products in any manner Seller chooses, including, without limitation, through its own retail outlets or through designated wholesalers or other retailers.

11.    **DELIVERIES.**

(a)    All Products will be sold by Seller to Retailer F.O.B. destination (Retailer's Station). Seller may, from time to time, change the delivery of any Product from destination to origin (the Plant), from origin to destination, or the origin point to a different one by giving Retailer at least 15 days' prior notice or such shorter notice as may be reasonable under the circumstances. Seller will specify in the notice to Retailer the change in delivery and the current Retailer price for the affected Product(s) F.O.B. the relevant location. If origin delivery is designated in any such notice, Seller shall arrange for transportation of the Products, at Retailer's expense, from the origin point to Retailer's Station at rates not exceeding those generally available from common carriers at the time of delivery.

(b)    Seller reserves the right to use, and require Retailer to use, Seller's automated Product inventory ordering and management program. If Retailer does not lease Retailer's Station from Seller, Retailer, at Retailer's expense, shall obtain any

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

permits and install the necessary equipment at Retailer's Station to be compatible, and communicate, with Seller's automated Product inventory ordering and management system.

(c)    For Products sold F.O.B. destination, title and risk of loss passes to Retailer when the Products pass the fill tube connection into Retailer's storage equipment. For Products sold F.O.B. origin, title and risk of loss passes to Retailer when the Products pass from Seller's delivery line into the receiving connection of the transportation equipment provided for Retailer's account.

(d)    Seller may make deliveries of the Products to Retailer's Station by any means of transportation. Retailer shall allow shipments in transport trucks provided by Seller to be unloaded immediately upon arrival. Retailer shall pay for any time in excess of the free unloading time for contract or common carriers as identified in the contract or tariff. Retailer will be allowed one hour of free time for unloading trucks owned or operated by Seller after which Retailer shall pay $25.00 per quarter hour until the shipment is unloaded.

(e)    Seller is not obligated to make any delivery outside of its usual business hours or in any quantity less than a full load. Retailer shall pay for any redistribution charges if Retailer, without justification, fails to accept all of any delivery by Seller.

## 12.    TRANSACTION CARDS.

(a)    As long as Seller elects to accept specified credit cards, credit identifications, debit cards, pre-paid cards, or other transaction authorization cards (collectively "Transaction Cards") in the state in which Retailer's Station is located, Retailer shall accept all Transaction Cards identified in Seller's Transaction Card guide ("Guide") for the purchase of authorized products and services. Retailer shall account for and process all such transactions in strict compliance with the terms set forth in the Guide, as may be amended by Seller from time to time. If Seller amends the Guide, Seller shall provide Retailer with notice. Seller may assess Buyer a Transaction Card processing fee (which includes any VSAT related charges) for providing such services.

(b)    Seller shall accept from Retailer all transactions generated as a result of purchases made with authorized Transaction Cards and processed in accordance with the terms in the Guide. At Seller's option, Seller shall pay the amount of the transactions to Retailer, after deducting any processing fee in effect under Seller's then current Guide, by: (1) check to Retailer; (2) a credit to Retailer's bank account by EFT; or (3) setting off the amount against Retailer's account with Seller.

(c)    For each transaction not authorized, disputed by a customer, or otherwise subject to chargeback under the Guide, Seller may either charge the amount to Retailer's account or require Retailer to make immediate refund to Seller, including refund by draft or EFT initiated by Seller, without any deduction for any processing fee.

(d)    This Article 12(d) is not applicable to Retailers who lease Retailer's Station from Seller. In order to provide efficient service to the motoring public, Retailer shall comply with Seller's software and hardware standards, established from time to time by Seller, relating to Electronic Point of Sale ("EPOS") systems, including, but not limited to, Seller approved compatible hardware, customer activated terminals, integrated and non-integrated EPOS systems, and other requirements necessary to electronically accept and process the Transaction Cards at all times during the term of this Agreement. Retailer shall upgrade the EPOS system with any new release of the software within 9 months after notice from Seller. Further, if Seller loans or leases any imprinter, EPOS terminal, or other related equipment to Retailer in connection with acceptance of the Transaction Cards, Retailer shall (1) comply with the terms of the Guide, (2) execute any applicable Seller agreements, relating to the use of such equipment and (3) reimburse Seller for any charges for use of such equipment (whether third party or internal) incurred by Seller.

(e)    Without limiting any rights or remedies available to Seller, if Retailer fails to comply with this article or the Guide, Seller may limit or terminate Retailer's right to participate in Seller's Transaction Card program. Further, Seller may terminate its Transaction Card program at any time upon notice to Retailer.

13.    **INSPECTION AND AUDIT.**    Seller, its agents, and representatives may enter Retailer's Station, at all reasonable times, to inspect the facilities, procedures, and materials being used in the purchase and sale of the Products, to obtain samples of and conduct tests on the Products, to inspect the books and records pertaining to the purchase and sale of Products, and to audit, observe, and otherwise verify Retailer's compliance with this Agreement.

14.    **TAXES.** Retailer shall pay all federal, state, and local taxes, excises, duties, and other assessments and charges of any kind and nature, now or hereafter levied ("Taxes") assessed by any governmental authority relating to the importation, manufacture, sale, purchase, transportation, storage, resale, or use of the Products insofar as the same is not expressly included in the price for the Products or other products. If Retailer pays directly any Tax normally remitted by Seller, Seller may require proof of

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

payment of such charges from Retailer and may require Retailer to provide a bond or other form of security necessary to protect Seller against loss arising from nonpayment. Retailer shall furnish Seller with satisfactory Tax exemption certificates where an exemption is claimed.

### 15.   WARRANTY AND DISCLAIMER.

SELLER WARRANTS THAT ALL PRODUCTS SOLD TO RETAILER WILL MEET SELLER'S THEN CURRENT SPECIFICATIONS. SELLER MAKES NO OTHER WARRANTIES OF ANY KIND AS TO THE PRODUCTS SOLD TO RETAILER, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

### 16.   CLAIMS.

(a)   Except as provided in Article 16(b), Seller will not be liable to Retailer for any defect in quality or shortage in quantity of the Products unless: (1) Retailer gives Seller notice within 2 business days after delivery for shortages and within 5 days after delivery for quality defects (or 5 days after discovery if the defect is latent) and (2) Retailer provides Seller with a reasonable opportunity to inspect, take samples, and test the Products that are the subject of the claim.

(b)   If Seller makes unattended deliveries to Retailer's Station, unless Seller receives notice from Retailer within 2 business days after invoicing that there is a discrepancy and the details thereof, Retailer agrees that the quantity billed by Seller is correct. Retailer further agrees that if Retailer reports a dispute to Seller as to quantity within 2 business days after date of invoice, that Seller's Polecat or other real time inventory report will be conclusive proof of delivery and the quantity thereof. If Retailer is not on Seller's Polecat or similar inventory system, then the bill of lading signed by the driver will be conclusive proof of delivery and the quantity.

(c)   Except for claims relating to indemnification obligations under this Agreement, indebtedness, Seller's equipment, or as otherwise specified in this Agreement the parties will not be liable to each other for any other claim arising out of this Agreement unless the claimant provides the other party with written notice of the claim (setting forth fully the facts on which the claim is based) within 180 days after the date on which the claim arose.

### 17.   COMPLIANCE WITH LAWS.

(a)   Retailer shall comply with all Laws relating to the Retailer's Station and the business conducted thereon, including, but not limited to, those pertaining to environmental protection, safety, and health matters.

(b)   Without limiting the generality of the foregoing, Retailer shall comply with all Laws, licenses, and permits relating to unleaded gasoline, oxygenated gasoline, reformulated gasoline, Reid vapor pressure, fuel additives, and diesel fuel as specified in Exhibit B, as may be amended by Seller from time to time upon notice to Retailer. Further, if Retailer owns or operates any UST system (as defined in applicable Laws), Retailer shall comply with all applicable Laws governing UST systems, including, but not limited to, financial responsibility requirements through mechanisms provided for in said Laws such as guarantees, surety bonds, and insurance.

### 18.   EXCUSES FOR NONPERFORMANCE.   Both parties will be excused from their obligations under this Agreement (except for financial obligations) to the extent that performance is delayed or prevented by any of the following matters: circumstances reasonably beyond the parties' control including, but not limited to, flood, ice storm, snowstorm, or earthquake; fire or explosion; delay or loss of transportation or delivery equipment; mechanical breakdown; strikes or other labor trouble, plant shutdown, riots, or other civil disturbances; or voluntary or involuntary compliance with any Law or request of any governmental authority.

### 19.   INDEMNITY.

(a)   TO THE EXTENT PERMITTED BY LAW, RETAILER SHALL INDEMNIFY AND DEFEND SELLER, ITS MEMBERS, SUBSIDIARIES, AFFILIATES AND JOINT VENTURE PARTNERS, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS ("INDEMNIFIED PARTIES") AGAINST ALL CLAIMS, DEMANDS, CAUSES OF ACTION, SUITS, DAMAGES, JUDGMENTS, LIENS, PENALTIES, AND EXPENSES, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND LITIGATION COSTS, WHETHER INCURRED FOR AN INDEMNIFIED PARTY'S PRIMARY DEFENSE OR FOR ENFORCEMENT OF ITS INDEMNIFICATION RIGHTS

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

(COLLECTIVELY, "CLAIM"), INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR HARM, INJURY, OR DEATH TO ANY PERSON, OR DAMAGE TO PROPERTY OR TO THE ENVIRONMENT ARISING OUT OF OR IN CONNECTION WITH ANY OF THE FOLLOWING MATTERS:

      (1)    RETAILER'S PERFORMANCE OR NONPERFORMANCE UNDER THIS AGREEMENT;

      (2)    ANY ACTION OR OMISSION OF RETAILER OR RETAILER'S EMPLOYEES, AGENTS, CONTRACTORS, ASSIGNS, OR THIRD PARTIES; AND

      (3)    THE OPERATION OF RETAILER'S BUSINESS.

RETAILER'S OBLIGATION TO INDEMNIFY AND DEFEND EXTENDS TO ANY CLAIM CAUSED BY THE CONCURRENT OR CONTRIBUTORY NEGLIGENCE OR FAULT OF AN INDEMNIFIED PARTY BUT NOT TO ANY CLAIM SHOWN BY FINAL NONAPPEALABLE JUDGMENT TO HAVE BEEN CAUSED BY THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE OR ANY DEFECT IN THE PRODUCTS NOT CAUSED OR CONTRIBUTED TO BY ANY NEGLIGENCE OR FAULT OF RETAILER.

      (b)    WITHIN 24 HOURS AFTER THE OCCURRENCE OF WHICH MAY RESULT IN A CLAIM RETAILER SHALL REPORT THE SAME TO SELLER BY TELEPHONE AND SHALL PROMPTLY THEREAFTER CONFIRM THE SAME BY WRITTEN NOTICE, INCLUDING ALL CIRCUMSTANCES THEREOF KNOWN TO RETAILER OR RETAILER'S EMPLOYEES.

      (c)    PROMPTLY AFTER RECEIVING NOTICE, AT RETAILER'S EXPENSE, RETAILER SHALL INVESTIGATE, RESPOND TO, AND DEFEND ANY CLAIM ASSERTED AGAINST ANY INDEMNIFIED PARTY, INCLUDING, WITHOUT LIMITATION, ANY CLAIM ALLEGING THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE. THE INDEMNIFIED PARTY MAY PARTICIPATE IN THE DEFENSE AND SETTLEMENT OF ANY CLAIM OR LITIGATION WITH ATTORNEYS OF THE INDEMNIFIED PARTY'S SELECTION WITHOUT RELIEVING RETAILER OF ANY OBLIGATIONS UNDER THIS ARTICLE; PROVIDED, HOWEVER, THE INDEMNIFIED PARTY SHALL BE RESPONSIBLE FOR ITS OWN ATTORNEYS' FEES. SELLER SHALL REIMBURSE RETAILER FOR THE AMOUNT OF ANY JUDGMENT AND REASONABLE DEFENSE COSTS PAID BY RETAILER WHICH REPRESENTS THE INDEMNIFIED PARTY'S TOTAL LIABILITY FOUND BY FINAL NONAPPEALABLE JUDGMENT TO HAVE BEEN CAUSED BY THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE OR PRODUCT DEFECT AS SPECIFIED ABOVE.

      (d)    THE INSURANCE REQUIREMENTS OF ARTICLE 20 DO NOT LIMIT OR RESTRICT IN ANY WAY RETAILER'S OBLIGATIONS UNDER THIS ARTICLE.

      (e)    RETAILER'S OBLIGATIONS UNDER THIS ARTICLE SURVIVE TERMINATION OR NONRENEWAL OF THIS AGREEMENT.

    20.    INSURANCE.

      (a)    Retailer shall maintain, at its sole cost, at all times during the term of this Agreement, the following insurance coverage with providers satisfactory to Seller with limits not less those limits below (the "Insurance"):

      (1)    Garage Insurance with limits of $1,000,000 each occurrence and $1,000,000 general aggregate and Garagekeepers Legal Liability Insurance with a limit of $50,000 each occurrence, such policy to include endorsement GL 20 10 Broadened Coverage, with Fire Legal Liability limits of $300,000 each occurrence. Retailers owning or operating up to and including 3 locations are subject to the minimum limits above. Retailers owning or operating 4 up to and including 5 locations shall amend their Garage policy aggregate to $3,000,000. Retailers owning or operating 6 or more locations shall amend their Garage policy aggregate to $5,000,000. In lieu of amending aggregate limits as described in this article, endorsement CG 2504 or its equivalent amending aggregate limits per location may be utilized when applied to the above-described minimum limits. Limits in excess of $1,000,000 may be provided by Excess or Umbrella Liability coverage. This Insurance is only required for those locations engaged in automotive repairs, and should be used in lieu of Commercial General Liability insurance in Article 20(a)(2) below. As applicable, Retailer shall maintain the following:

(i)    Liquor Liability Insurance if Retailer owns or operates the location and alcoholic beverages are sold at the location, utilizing endorsement CG 24 08 or its equivalent.

(ii)    Marine Terminal or Wharfingers Liability Insurance if Retailer operates a marine facility. If Retailer supplies the marine facility via watercraft the watercraft exclusion must be deleted or equivalent coverage purchased.

(2)    Commercial General Liability Insurance unamended or Comprehensive General Liability Insurance with Broad Form CGL endorsement with limits of $1,000,000 each occurrence and $1,000,000 general aggregate, with Fire Legal Liability limits of $300,000 each occurrence. Retailers owning or operating up to and including 3 locations are subject to the minimum limit above. Retailers owning or operating 4 up to and including 5 locations shall amend their policy aggregate to $3,000,000. Retailers owning or operating 6 or more locations shall amend their policy aggregate to $5,000,000. In lieu of amending aggregate limits as described in this article, endorsement CG 2504 amending aggregate limits per location may be utilized when applied to the above-described minimum limits. Limits in excess of $1,000,000 may be provided by Excess Liability or Umbrella Liability coverage. As applicable, Retailer shall maintain the following:

(i)    Liquor Liability Insurance if Retailer owns or operates the location and alcoholic beverages are sold at the location, utilizing endorsement CG 24 08 or its equivalent.

(ii)    Marine Terminal or Wharfingers Liability Insurance if Retailer operates a marine facility. If Retailer supplies the marine facility via watercraft the watercraft exclusion must be deleted or equivalent coverage purchased.

(3)    Business Automobile Liability Insurance covering all vehicles used in the operations of the Retailer with limits of liability of: Bodily injury $1,000,000 each person, $1,000,000 each accident; Property damage $1,000,000; or a Combined Single Limit of  $1,000,000 for bodily injury and property damage, such policy to be endorsed with MCS-90 when hazardous material transportation is involved.

(4)    Workers' Compensation Insurance or Longshoremens's' and Harborworkers' Compensation Insurance as required by Laws and regulations applicable to and covering employees of Retailer during the term of this Agreement.

(5)    Employers' Liability Insurance protecting Retailer against common law liability, in the absence of statutory liability, for employee bodily injury arising out of the master-servant relationship with a limit of $500,000 Each Accident, $500,000 Disease-Policy Limit;  $500,000 Disease-Each Employee.

(b)    Retailer shall assure that the Insurance policies: (1) provide a waiver of subrogation in favor of Seller where permissible by Law, (2) allow for the separation of insureds, and (3) provide for written notice of cancellation or material change.  Notice of cancellation or change will not affect the Insurance until 30 days after Seller receives written notice.  Any deductible or retention of insurable risks will be for the Retailer's account.

(c)    Retailer shall assure the Insurance required in this article and each certificate evidencing the Insurance issued to Retailer names Seller and its members, subsidiaries, affiliates and joint venture partners, to the extent of their interest, as additional insureds (Article 20(a)(1) and (2) as applicable), without regard to the allocation of liability provisions contained in this Agreement, to the extent of any claim, loss or liability within the scope of the required Insurance. The parties intend that, to the extent of their interest, the status of Seller and its members, subsidiaries, affiliates and joint venture partners as additional insureds will not be limited. Retailer shall secure from its insurance companies and provide to Seller, for all required Insurance (Article 20(a)(1) and (2) as applicable), an additional insured endorsement with terms equivalent to ISO Form CG 20 26 11 85.

(d)    At the time of execution of this Agreement and during the term of this Agreement, Retailer shall provide Seller with a certificate of Insurance evidencing Retailer's compliance with Seller's Insurance requirements.  Retailer's failure to provide certificates evidencing the requirements or purchase Insurance coverage in compliance with this article will not relieve Retailer of its obligations in this article.

## 21.    ASSIGNMENTS, ENCUMBRANCES, AND RIGHT OF FIRST REFUSAL.

(a)    <u>Assignment by Retailer</u>.    This Agreement is personal to Retailer. If Seller elects not to exercise Seller's right of first refusal as set forth below, Retailer may sell, transfer, encumber, or assign its interest under this Agreement or in Retailer's Station, in whole or in part, or sublease any portion of Retailer's Station, whether voluntarily, involuntarily, or by operation of Law (collectively, "Transfer") with the prior written consent of Seller, which consent may be withheld consistent with applicable

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

Law. Notwithstanding the foregoing, if Retailer leases Retailer's Station, Retailer may only Transfer its interest under this Agreement as it pertains to the operation of a motor fuel dispensing station or automobile service station, as the case may be, and, except for an authorized car wash, food mart, convenience store, or snack shop (as the case may be), any facilities for uses otherwise authorized under this Agreement revert back to Seller, at Seller's sole discretion. Seller's consent to Transfer may be conditioned upon, but not limited to, the (1) proposed transferee satisfying all of Seller's then current requirements for the qualification of new retailers; (2) Retailer satisfying all indebtedness owed by Retailer to Seller; and (3) proposed transferee agreeing to be bound by all the terms and conditions of this Agreement. Seller will have 60 days (or any lesser period specified by Law), after receipt of Retailer's request for Seller's consent to Transfer and all qualification information reasonably required by Seller, to provide Retailer with written notice of its decision to grant or withhold consent. Seller's consent to any Transfer is not a waiver of the provisions of this article as to any future transaction. Any Transfer by Retailer without Seller's prior written consent is void.

(b)    Trial Franchise.    Except for retailers in California or otherwise to the extent limited by applicable Law, if Retailer desires to Transfer its interest in this Agreement to an individual or Business Entity that has not previously operated as a retailer of: (1) Seller, (2) Seller's affiliates, or (3) a major oil company authorized to sell the company's branded petroleum products within the 5 year period preceding the Effective Date of this Agreement, then Retailer may be required to execute a trial franchise termination of this Agreement and the proposed transferee may be required to execute a trial franchise agreement as a condition to Seller granting its consent to the Transfer. For the purposes of this article, "major oil company" means an entity that is fully integrated with substantial interests in both upstream and downstream (specifically including refining) and markets in two or more regions.

(c)    Transfer Events.    Without limiting the foregoing, the following events constitute a Transfer:

(1)    Subject to Article 24 Retailer dies and Retailer's interest in this Agreement is transferred, whether by will or operation of Law;

(2)    Retailer becomes bankrupt or insolvent, Retailer makes an assignment for the benefit of creditors, or a proceeding is instituted under the Bankruptcy Code, and, if it is an involuntary proceeding, Retailer or other affected party has not had it dismissed within 60 days;

(3)    A writ of attachment or execution is levied on this Agreement and is not removed by Retailer within 30 days;

(4)    A receiver is appointed with authority to take possession of Retailer's Station and is not removed within 60 days in any proceeding or action to which Retailer is a party;

(5)    If Retailer is a limited liability partnership or partnership, a withdrawal or any change of interest (voluntary, involuntary or by operation of Law) of any partner or the dissolution of the partnership;

(6)    If Retailer is a limited liability company or a corporation, any dissolution, merger, consolidation or other reorganization, or other arrangement having similar effect, or the Transfer by Retailer or any member or shareholder of 10% or more of the voting shares of the capital stock of Retailer or of any lesser interest which cumulatively vests 10% or more of such voting shares in the transferee; and

(7)    If Retailer is composed of more than one person, any change of interest (voluntary, involuntary or by operation of Law) of any such person.

(d)    Right of First Refusal.    Retailer may not Transfer any of Retailer's interest in this Agreement without first offering, in writing, to Transfer the same to Seller or its designee on the same terms and conditions expressly agreed to between Retailer and the third party ("Transferee"). Seller will have 30 days after receipt of the offer and a complete and exact copy of the agreement with the Transferee to accept or reject the offer. If Seller rejects the offer and consents to the Transfer as set forth in 22(a) above, Retailer may make the proposed Transfer to the Transferee, but not at a lower price or on more favorable terms than those offered to Seller. If the Transfer to the Transferee is not consummated within 4 months from the expiration of the 30-day period, Retailer shall re-offer the interest to Seller in accordance with the foregoing provisions.

(e)    Transfer Fee.    This article is not applicable to Retailers who lease the Retailer's Station from Seller. Except for retailers in New Hampshire and Virginia which will be governed by applicable state Law, to the maximum extent permitted by Law, if Seller consents to any Transfer, Retailer shall pay to Seller a franchise transfer fee of $6500.00 in the form of a bank

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

cashiers check prior to or at the closing of any Transfer. With the exception of a Transfer in the event of Retailer's death, long term disability, or sickness (6 months or more) that prevents Retailer from operating the business at the Retailer's Station, the Transfer Fee is applicable to all Transfers, including a Transfer to the Seller.

(f)    <u>Assignment by Seller</u>.    Seller may Transfer its interest, in whole or in part, in this Agreement.

## 22.    TERMINATION OR NONRENEWAL.

(a)    <u>Termination by Seller</u>.    Subject to any limitations imposed by Law, and in addition to all other rights or remedies available, Seller may terminate this Agreement for any of the following grounds.

(1)    Retailer's failure to comply with any provision of this Agreement, which provision is both reasonable and of material significance to the relationship under this Agreement;

(2)    Retailer's failure to exert good faith efforts to carry out the provisions of this Agreement;

(3)    The occurrence of an event which is relevant to the relationship under this Agreement and as a result of which termination of this Agreement is reasonable, including, without limitation, the following events:

(i)    Retailer's fraud or criminal misconduct relevant to the operation of Retailer's Station;

(ii)    Retailer's declaration of bankruptcy or judicial determination of insolvency;

(iii)    Retailer's continuing severe physical or mental disability if Retailer is an individual, or if Retailer is a partnership or corporation, the disability of any individual who is currently in "control" of the ownership interest of Retailer ("control" being the authority to direct the operations of Retailer and to have or exercise management responsibility), of at least 3 months' duration that renders Retailer unable to provide for the continued proper operation of Retailer's Station ("Disability");

(iv)    Condemnation or other taking, in whole or in part, of Retailer's Station pursuant to the power of eminent domain;

(v)    Loss of Seller's right to grant the right to use the Identifications, which are the subject of the franchise;

(vi)    Destruction (other than by Seller) of all or a substantial part of Retailer's Station;

(vii)    Retailer's failure to pay to Seller in a timely manner when due all sums to which Seller is legally entitled, including, without limitation, any sums due Seller under any lease or other agreement entered into between the parties;

(viii)    Retailer's failure to maintain a sufficient amount of all grades of Products for resale at Retailer's Station, or Retailer's failure to operate Retailer's Station, for 7 consecutive days, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(ix)    Retailer's willful adulteration, mislabeling, or misbranding of motor fuels or other trademark violations;

(x)    Retailer's knowing failure to comply with the Laws relevant to the operation of Retailer's Station;

(xi)    Retailer's conviction of any felony involving moral turpitude;

(xii)    Subject to Article 24, Retailer's death if Retailer is an individual, or if Retailer is a partnership or corporation, the death of any individual who is currently in "control" of the ownership interest of Retailer ("control" being the authority to direct the operations of Retailer and to have or exercise management); and

(4)    A determination is made by Seller in good faith and in the normal course of business to withdraw from marketing of motor fuel through retail outlets in the relevant geographic market area in which Retailer's Station is located;

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

(5)    If Retailer leases Retailer's Station from Seller and the lease is terminated or not renewed or if Retailer does not lease Retailer's Station from Seller and Retailer has entered into an agreement with Seller that requires timely completion of construction of improvements that Seller has terminated for Retailer's failure to comply with the construction completion requirement; or

(6)    Any other ground for which termination is provided for in this Agreement or is otherwise allowed by the PMPA or other applicable law.

(b)    Nonrenewal by Seller.    Subject to any limitations imposed by Law, and in addition to all other rights or remedies available, Seller may not renew this Agreement for any of the following grounds.

(1)    Any of the grounds specified in Article 22(a);

(2)    If Retailer leases Retailer's Station from Seller and the lease is terminated or not renewed; or

(3)    Any other ground for which nonrenewal is provided for in this Agreement or is otherwise allowed by the PMPA or other applicable Law.

(c)    Termination Prior to Effective Date.    If after execution of this Agreement Seller has grounds to terminate or not renew any then existing Retail Sales Agreement between the parties, or to terminate this Agreement as if it were then in its term, Seller may terminate this Agreement, as well as any existing Retail Sales Agreement, based on those grounds.

(d)    Mutual Termination.    The parties may terminate or not renew this Agreement by mutual written agreement in the form and manner permitted by the PMPA.

## 23.    RIGHTS AND DUTIES UPON TERMINATION OR NONRENEWAL.

(a)    Upon termination or nonrenewal of this Agreement, Retailer shall immediately cease marketing and selling the Products and otherwise using the Identifications or any marks confusingly similar thereto. Without limiting the generality of the foregoing, if Retailer does not lease Retailer's Station from Seller, Retailer shall, at Retailer's expense: (1) remove, and if requested by Seller return, all signs or materials bearing any of the Identifications including, if applicable, the Lazy S canopy fascia, illuminated light bar, and the building portico; (2) remove and destroy, or permanently paint over, all other brand Identification items, advertising displays, color schemes and other materials bearing any of the Identifications (whether used on buildings, equipment, tanks, trucks, automobiles or stationery); and (3) return any equipment loaned or leased to Retailer.

(b)    If Retailer fails for any reason to cease marketing and selling the Products or otherwise using any of the Identifications immediately upon the effective date of termination or nonrenewal, then Seller may enter Retailer's premises to carry out Retailer's obligations under Article 23(a) above, at Retailer's expense. Retailer shall not interfere, and will not permit any of its employees, agents or representatives to interfere, with Seller's rights under this article. Seller's exercise of its right of entry will not constitute a trespass or other tort.

(c)    In addition to all other rights or remedies available, Seller will be entitled to injunctive and equitable relief for any violation of this article.

## 24.    SUCCESSOR IN INTEREST.

(a)    Except for retailers in Indiana and Virginia, Retailer may designate, in writing, a surviving spouse; adult child, stepchild, brother, or sister; or parent of Retailer ("Designee") for Seller to consider accepting as a new franchisee in the event of Retailer's death or Disability as defined in Article 22(a)(3)(iii). Retailer's designation revokes all prior designations, and will terminate upon termination, nonrenewal, or Transfer of this Agreement, upon Retailer's delivery to Seller of a written revocation or new designation, or upon Retailer's divorce from a designated spouse. If the Designee has been significantly involved in the Retailer's business at Retailer's Station (as reasonably determined by Seller) and meets all the standards normally required by Seller of a franchisee, Seller shall offer to enter into a new sales agreement and any related agreements constituting a franchise between the parties at Retailer's Station with the Designee on Seller's then-current terms and conditions; provided, however, Seller shall not be required to extend credit to the Designee without adequate security. If the Designee meets all of the standards normally required by Seller of a franchisee, but has not been significantly involved in Retailer's business at Retailer's Station (as reasonably determined by Seller), Seller shall offer to enter into

- 14 -

a trial franchise agreement with the Designee; provided, however, that Seller shall not be required to extend credit to the Designee without adequate security.

(b)     Retailers in Indiana: Retailer designates as successor in interest under this Agreement and any related agreements constituting the franchise between Seller and Retailer (collectively, the "Franchise Agreement") _____ [spouse, adult child or stepchild, or guardian of the Retailer's child or stepchild] ("Designee"). Seller receives this designation subject to the provisions of Indiana Code §§ 23-2-2.5-1(o) and (p) and 23-2-2.5-51 and Seller's rights under the PMPA and other Laws. Designee shall have 30 days after Retailer's death to give Seller written notice of Designee's intention to succeed to the Franchise Agreement. Designee must sign and date the notice and provide to Seller in accordance with Article 28. The notice must read as follows: "The undersigned Designee gives notice of its intent to succeed to the interest of the deceased Retailer under the Franchise Agreement effective _____ pertaining to the sale of Products at the station located at _____. Designee agrees to be bound by all terms and conditions of Retailer's existing Franchise Agreement. Designee must also meet Seller's reasonable normal qualifications for Seller's new retailers at the time of any succession to rights."

(c)     Retailers in Virginia: Retailer designates as successor in interest under this Agreement and any related agreements constituting the franchise between Seller and Retailer (collectively, the "Franchise Agreement") _____ [spouse, adult child or stepchild, or adult brother or sister] ("Designee"). Seller receives this designation subject to the provisions of Code of Virginia §§ 59.1-21.10 and 29.1-21.11(8) and Seller's rights under the PMPA and other Laws. Designee must meet Seller's reasonable and uniform standards for Seller's new retailers at the time of this designation and at the time of the succession to Retailer's interest in the Franchise Agreement. Further, subject to Article 21(b), Seller may require Designee to accept a trial franchise within 21 days after Retailer's death or other event allowing succession.

**25.     RETAILER'S INDEPENDENCE.**  Retailer is an independent businessperson, and nothing in this Agreement may be construed as reserving to Seller any right to exercise any control over, or to direct in any respect the conduct or management of, Retailer's business or operations conducted pursuant to this Agreement, but the entire control and direction of such business and operations are and will remain in Retailer, subject only to Retailer's performance of the obligations of this Agreement. Neither Retailer nor any person performing any duties or engaged in any work at Retailer's Station for or on behalf of Retailer will be deemed an employee or agent of Seller, and none of them is authorized to impose on Seller any obligations or liability whatsoever.

**26.     BUSINESS ENTITY OR JOINT RETAILER.**

(a)     If Retailer is comprised of more than one person, the obligations imposed under this Agreement are joint and several as to each person and all of the terms apply to each person with the same effect as though that person were the sole Retailer.

(b)     If Retailer is a Business Entity, all obligations and provisions of this Agreement of a personal nature apply as if the Business Entity were an individual and, insofar as is legally possible and reasonably practicable, to those individuals who have or exercise management responsibility for the Business Entity, including, without limitation, officers, directors or agents of corporations and partners of partnerships. The Business Entity must manage its affairs with respect to the personal obligations and provisions in a manner so as to give full force and effect to the same. Subject to Seller's prior written approval, if Retailer is a Business Entity, Retailer shall designate a Key Management Person as identified in PART I to exercise primary management responsibility for Retailer's day-to-day operations. Seller may look to the Key Management Person in connection with performance of the personal obligations. Retailer may change Retailer's Key Management Person upon Seller's prior written approval.

**27.     ACTS ATTRIBUTABLE TO RETAILER.**  The acts or omissions of Retailer's employees, agents, and contractors are the acts or omissions of Retailer. If Retailer is comprised of more than one person, the acts or omissions of each such person are the acts or omissions of Retailer. If Retailer is a Business Entity, in addition to those persons mentioned above, the acts or omissions of the Key Management Person designated in PART I and of each partner, shareholder or member, as the case may be, are the acts or omissions of Retailer.

**28.     NOTICES.**

(a)     Except as otherwise specified in this Agreement, all notices must be in writing and in compliance with the PMPA and other applicable Law. Subject to any requirements of Law, any notice (including price notifications) may be given to Retailer by personal service or by electronic mail or to either party by certified mail, regular mail, telegram, facsimile, mailgram, or overnight or local courier. Notice will be deemed given when: (1) deposited in the U.S. Mail, postage or charges pre-paid and directed to the party for whom intended at the address in this Agreement or such other address as directed by the party upon written notice to

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

the other if given by certified mail or regular mail; (2) deposited with the dispatching agency, postage or charges pre-paid and directed to the party for whom intended at the address in this Agreement or such other address as directed by the party upon written notice to the other if given by telegram, mailgram or overnight or local courier; (3) confirmation is received by the sending party if given by facsimile; or (4) Seller is electronically notified by its electronic mail provider or program of delivery to Retailer if given by electronic mail.

(b)    If Retailer is a Business Entity, Seller may give notice to: (1) the Key Management Person; (2) any officer or director of a corporation or limited liability company; (3) any partner of a partnership or limited liability partnership; or (4) any personal representative, agent, or employee of any other Business Entity.

(c)    To enable Seller to send notices and communications to Retailer by electronic mail: (1) Retailer's computer must be configured in accordance with Seller's specifications in effect from time to time; (2) Retailer must have access to the internet; and (3) Retailer shall have at all times during the term of this Agreement an active E-mail address and Retailer shall promptly advise Seller of such address and of any change thereto.

**29.    ATTORNEY'S FEES.**  The prevailing party will be entitled to recover from the other party reasonable attorney's fees and other legal costs the party incurs in order to secure, defend or protect the rights inuring to the prevailing party under this Agreement, or to enforce the terms thereof.

**30.    GENERAL PROVISIONS.**

(a)    This Agreement as of the Effective Date hereof cancels and supersedes all prior and contemporaneous representations, inducements, agreements, commitments, and undertakings with respect to the subject matter of this Agreement, except those written agreements relating to any indemnification, reimbursement, indebtedness, or debt security obligations (including, but not limited to, any security interest, security agreement, guaranty, mortgage, deed of trust, promissory note, or UCC filing).

(b)    Except as expressly provided under this Agreement, this Agreement may be amended or supplemented only in writing signed by both parties.

(c)    Any waiver of any provision of this Agreement must be in writing signed by the parties. Either party's delay or failure to enforce any provision of this Agreement or any course of dealing or trade custom or usage will not operate as a waiver of compliance with that provision or a waiver or estoppel of the party's right to enforce any other provision of this Agreement.

(d)    The provisions of this Agreement are severable. If any provision of this Agreement is, for any reason, invalid or unenforceable, the remaining provisions of this Agreement are valid and enforceable if the basic intent of the parties is still capable of being achieved.

(e)    This Agreement is binding upon and enforceable against the parties' respective successors, permitted assignees, legal representatives, executors, administrators, heirs, and legatees.

(f)    Neither this Agreement nor any subsequent agreement amending or supplementing this Agreement is binding unless a duly authorized representative of Seller signs the Agreement, amendment, or supplement.

(g)    For the purpose of Articles 30 (b), (c) and (f), signatures and writings in an electronic form do not constitute or create a writing signed by a party.

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

Exhibit A

**Authorized Facilities and Uses**

| ✓ | Use/Facility | Description (**Optional**) |
|---|---|---|
| | Alternative Motor Fuel (CNG, M-85, etc.) | |
| ✓ | ATM | |
| | Bill Boards | |
| | Car Wash | |
| | Check Cashing | |
| | Clothing (e.g., T-shirts, etc.) | |
| | Dry Cleaning | |
| ✓ | Food Mart/Convenience Store/Snack Shop | |
| | Insurance | |
| ✓ | Lottery Sales | |
| | Mail Box/Shipping | |
| | Money Wiring | |
| ✓ | Pay Phone, Telephone Booth, or Transmitter | |
| | Photo Services (Booth, Drop Off, etc.) | |
| ✓ | Propane | |
| | Quick Lube | |
| | QSR (Quick Service Restaurant) | |
| ✓ | Satellite | |
| | Ticket Agency/Mapping Services (e.g., through a Kiosk) | |
| | Vehicle Repair | |
| | Vending Machines | |
| | Video or Game Equipment | |
| | Video Rentals | |
| | Other | |
| | | |
| | | |
| | | |
| | | |
| | | |

❖ The above list is merely intended to be illustrative of the many uses/facilities potentially available to the Retailer as authorized by Seller but is not intended as a complete and definitive list.

Initials of both parties:

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

**Exhibit B**

**Environmental Regulation**
**Supplement**

In the operation of Retailer's Station, Retailer shall strictly comply with the regulations of the Environmental Protection Agency ("EPA") promulgated as Part 80 - REGULATION OF FUELS AND FUEL ADDITIVES, of Chapter I, Title 40, Code of Federal Regulations ("C.F.R."), and with any applicable state regulations covering gasoline and diesel fuel, as amended from time to time (the "Regulations"). "Gasoline," "Diesel Fuel," and other terms used in this Exhibit B have the same meanings as defined in the Regulations. With respect to Retailer's Station, Seller and Retailer agree as follows:

(a)    Seller's Responsibilities. Seller may:

(1)    Continuing for the period as Seller deems appropriate, in Seller's sole judgment, take periodic samples from Retailer's Product dispenser(s) or from other retailers supplied from the same Plant and test such samples to determine whether the Products are in compliance with the Regulations. Any such sampling and testing will not relieve Retailer of any obligation Retailer has under the Agreement or by Law to sell, dispense and offer for sale only Products complying with the Regulations.

(2)    Give prompt notice and details to Retailer (by telephone, followed by formal notice) if any test performed under (1) above, or through other circumstances known to Seller, indicates that Retailer's gasoline or diesel fuel inventory is not in compliance with the Regulations. Seller shall cooperate with Retailer in any further action taken that is necessary (including pump out) to restore the availability of complying Products. The costs of any such further action, including further sampling and testing, will be at Retailer's expense if the cause of contamination is within Retailer's control.

(3)    Arrange for painting the manhole covers and fill line caps to identify storage tanks dedicated to unleaded gasoline.

(b)    Retailer's Responsibilities.

(1)    Retailer shall use only facilities and equipment to store and dispense gasoline and diesel fuel which have been approved for such use by Seller.

(2)    Retailer shall not mix or allow to be mixed unleaded Seller-branded gasoline with any gasoline containing lead anti-knock agents. Retailer shall not sell as unleaded Seller-branded gasoline any unleaded Seller-branded gasoline which is mixed with lead anti-knock agents.

(3)    Retailer warrants that no leaded gasoline (i.e. gasoline containing unlawful amounts of lead or phosphorus) will be introduced into any motor vehicle which is labeled "UNLEADED GASOLINE ONLY" or which is equipped with a gasoline tank filler inlet which is designed for the introduction of unleaded gasoline only.

(4)    Retailer shall not sell, offer for sale, dispense, supply, offer for supply, transport, or cause the transportation of gasoline in which the Reid Vapor Pressure exceeds the legally applicable standard or where the oxygen content is below the legally applicable standard. Retailer shall not sell, offer for sale, dispense, supply, offer for supply, or transport reformulated gasoline which is below the legally applicable standard under the Law for the geographical area and time period in which such gasoline is intended to be dispensed to motor vehicles.

(5)    Retailer shall not sell, offer for sale, supply, dispense, offer for supply, transport, or cause the transportation of any diesel fuel for use in motor vehicles unless the diesel fuel (i) has a sulfur percentage, by weight, no greater than 0.05 percent, (ii) has a cetane index of at least 40, or a maximum aromatic content of 35 volume percent, (iii) is free of visible evidence of the dye 1,4-dialkylamino-anthraquinone and (iv) is free of visible evidence of the dye solvent red 164 unless it is used in a manner that is tax-exempt as defined under section 4082 of the Internal Revenue Code.

(6)    Retailer shall not sell, offer for sale, supply, offer for supply, transport, or cause the transportation of gasoline unless such gasoline is additized in accordance with the requirements of 40 C.F.R. section 80.161, as may be amended from time to time.

Rev 2002/10/24 (Ret053)
Retail Sales Agreement

(7)    Retailer shall maintain all hanging hardware for fuel pumps or dispensers in good operating condition and repair and otherwise in compliance with the Regulations. Hanging hardware includes, but is not limited to, whip hoses, breakaways, flow restrictors in the hose assembly, hoses, nozzles, nozzle spouts, swivels, splash guards, clamps, or colored scuff guards, including any associated with a vapor recovery system.

(8)    Retailer shall establish and enforce an oversight compliance program to assure that Retailer, Retailer's employees or agents, or third parties (including the employees, agents or contractors of Seller) will not cause, allow, or permit Retailer's Products to not be in compliance with the Regulations or become contaminated with any other gasoline or diesel fuel product or foreign substance, at any time after delivery by or for Seller to Retailer. The oversight program must include periodic sampling and testing by Retailer of Retailer's Products inventory; securing the manhole covers, fill line caps and dispensers to avoid unauthorized entry or use; and supervising and instructing Retailer's employees and others having access to Retailer's Products system regarding proper procedures to prevent Retailer's gasoline and diesel fuel from becoming noncompliant with the Regulations and to prevent contamination of Retailer's Products. **Retailer shall comply with all applicable Laws including those pertaining to underground storage tank ("UST") monitoring systems. Raising, removing, by-passing or disabling UST monitoring probes, alarms and systems or falsification of records of such systems is a violation of the Law and could result in the assessment of civil or criminal penalties by the appropriate governmental agency. Retailer should immediately notify the designated maintenance contractor for Retailer's Station and the sales consultant of any difficulties that may be experienced with the UST monitoring system.**

(9)    Retailer shall give prompt notice and details to Seller (by telephone to Seller's Region office) of (i) the EPA's or state agency's taking a sample of any Product to test for compliance with the Regulations and (ii) receipt of any test results from any such sampling.

(10)    Retailer shall give prompt notice and details to Seller (by telephone to Seller's Region office, followed by formal notice) of any circumstance or occurrence at Retailer's Station which reasonably could cause Retailer's Products, or dispensing equipment to not be in compliance with the Regulations. Upon discovery of any such condition Retailer shall cease selling, dispensing, or offering for sale such Products until Seller and Retailer can mutually determine by sampling, testing, or other means whether the Product is in compliance and, if found to be not in compliance, take such further action as is necessary (including pump out) to restore the availability of a complying product. The sampling, testing, or further action will be at Retailer's expense if the cause of contamination was within Retailer's control.

(11)    Retailer shall obtain, properly affix, and maintain all Product labels required by Law to be affixed at Retailer's Station, including gasoline and diesel fuel pump island and dispenser labels.

(12)    If Retailer fails to comply with the Laws relating to UST systems or those set forth in this Exhibit B, based upon evidence satisfactory to Seller, Seller may, in addition to other rights or remedies available to Seller, suspend deliveries of the affected Products to Retailer and enter Retailer's Station premises to take such appropriate action, in Seller's sole judgment (including padlocking the pump dispensers), to avoid any violation of this Agreement or the Regulations.

(13)    Retailer certifies that Retailer has read, understands, and is fully informed of the relevant Regulations pertaining to gasoline and diesel fuel, and Retailer shall fully comply with the provisions thereof whether or not such other obligations are referred to or restated in this Agreement.

Rev 2002/10/24 (Ret053)
Retail Sales Agreement



Cost Center #: 137711
Retailer SAP #: 241835

### Propane Rider to Retail Sales Agreement

Seller and Retailer are parties to a Retail Sales Agreement which governs the operation of the station located at:

| | |
|---|---|
| Street Address: | 1050 WASHINGTON STREET |
| City, State, Zip: | BRAINTREE, MA  02184 |
| | ("Premises"). |

Retailer desires to use and Seller hereby authorizes the use of the Premises for propane sales with the refueling of tanks on the Premises subject to the following terms and conditions:

1.      All of the terms and conditions of the Retail Sales Agreement are incorporated herein by reference and shall apply to any improvements and equipment on the Premises attributable to propane sales ("propane facilities") as well as propane storage, dispensing and sales activities.

2.      The general liability insurance coverage maintained by Retailer, in addition to all other insurance coverage required under the Retail Sales Agreement, shall be Commercial General Liability Insurance unamended to include Sudden and Accidental Pollution coverage with limits of $1,000,000.

3.      The propane facilities shall not bear any  Shell Identifications (trademarks, service marks, logos, color or other symbols) and shall display a conspicuous statement on the propane dispensing equipment that the propane contained therein is not Shell-branded product.

4.      Retailer hereby certifies to Seller that Retailer and all of Retailer's employees and agents (i) are and will remain familiar with the hazards of propane, (ii) have been and will remain duly trained in the storage, handling and use of propane and the maintenance and operation of propane facilities as necessary to permit safe, efficient and legal operation of the propane facilities, (iii) will provide information to propane purchasers as necessary to advise of the hazards of propane and to permit the safe and legal use thereof by such purchasers and (iv) take due care as is necessary to inform all propane purchasers that the propane is not Shell- branded product.

5.      Retailer hereby certifies that (i) due care was used in installing the propane facilities, (ii) the propane facilities (including the equipment and installation) comply with all laws, regulations and ordinances and  (iii) the propane facilities are safe for the purposes intended. Retailer shall not make any further attachments or additions to, or any alterations of, the propane facilities or the Premises without Seller's prior written consent.

6.      Retailer shall comply with all Laws, licenses, and permits as well as all generally accepted industry specifications and practices relating to the storage, dispensing and sale of propane.

7.      Retailer shall provide Seller a copy of all Material Safety Data Sheets applicable to its propane operations.

8.      Retailer shall ensure that the location of all propane facilities will not restrict traffic flow or product delivery, endanger customer safety or detract from appearance.

Accepted and agreed:

| LAKEVIEW AUTO CARE INC / LAKEVIEW AUTO CARE INC<br>**Retailer** | Shell Oil Products US<br>On behalf of<br>Motiva Enterprises LLC<br>**Seller** |
|---|---|
| By: | By: |
| Title:  PERSIDENT | Allen Girndt<br>Title:  Manager Contracts |
| Date:  5/8/03 | Date:  6/10/03 |

Rev. 2003/01/29 (Ret122)
Propane Rider To RSA

Form **W-9**
(Rev. January 2002)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give form to the
requester. Do not
send to the IRS.

Name

Business name, if different from above

LAKEVIEW AUTO CARE, INC

Check appropriate box: ☐ Individual/Sole proprietor  ☒ Corporation  ☐ Partnership  ☐ Other ▶ .................... ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)

1080 WASHINGTON ST.

Requester's name and address (optional)

City, state, and ZIP code

BRAINTREE MA 02184

List account number(s) here (optional)

**Print or type** **See Specific Instructions on page 2.**

**Part I** **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN).
**However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on
page 2.** For other entities, it is your employer identification number (EIN). If you do not have a number,
see How to get a TIN on page 2.

**Note:** If the account is in more than one name, see the chart on page 2 for guidelines on whose number
to enter.

Social security number

| | | | | | | | |

or

Employer identification number

| 0 | 4 | 3 | 4 | 8 | 2 | 1 | 9 | 5 |

**Part II** **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), **and**

2. I am not subject to backup withholding because: **(a)** I am exempt from backup withholding, or **(b)** I have not been notified by the Internal
Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or **(c)** the IRS has
notified me that I am no longer subject to backup withholding, **and**

3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup
withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply.
For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement
arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must
provide your correct TIN. (See the instructions on page 2.)

| Sign Here | Signature of U.S. person ▶ | Date ▶ 5/8/03 |

**Purpose of Form**

A person who is required to file an information
return with the IRS must get your correct
taxpayer identification number (TIN) to report, for
example, income paid to you, real estate
transactions, mortgage interest you paid,
acquisition or abandonment of secured property,
cancellation of debt, or contributions you made
to an IRA.

**Use Form W-9 only** if you are a U.S. person
(including a resident alien), to give your correct
TIN to the person requesting it (the requester)
and, when applicable, to:

1. Certify the TIN you are giving is correct (or
you are waiting for a number to be issued),

2. Certify you are not subject to backup
withholding, or

3. Claim exemption from backup withholding if
you are a U.S. exempt payee.

If you are a foreign person, use the
appropriate Form W-8. See Pub. 515,
Withholding of Tax on Nonresident Aliens and
Foreign Entities.

**Note:** If a requester gives you a form other than
Form W-9 to request your TIN, you must use the
requester's form if it is substantially similar to this
Form W-9.

What is backup withholding? Persons making
certain payments to you must under certain
conditions withhold and pay to the IRS 30% of
such payments after December 31, 2001 (29%
after December 31, 2003). This is called "backup
withholding." Payments that may be subject to
backup withholding include interest, dividends,
broker and barter exchange transactions, rents,
royalties, nonemployee pay, and certain
payments from fishing boat operators. Real
estate transactions are not subject to backup
withholding.

You will not be subject to backup withholding
on payments you receive if you give the
requester your correct TIN, make the proper
certifications, and report all your taxable interest
and dividends on your tax return.

Payments you receive will be subject to
backup withholding if:

1. You do not furnish your TIN to the
requester, or

2. You do not certify your TIN when required
(see the Part II instructions on page 2 for
details), or

3. The IRS tells the requester that you
furnished an incorrect TIN, or

4. The IRS tells you that you are subject to
backup withholding because you did not report
all your interest and dividends on your tax return
(for reportable interest and dividends only), or

5. You do not certify to the requester that you
are not subject to backup withholding under 4
above (for reportable interest and dividend
accounts opened after 1983 only).

Certain payees and payments are exempt
from backup withholding. See the instructions on
page 2 and the separate Instructions for the
Requester of Form W-9.

**Penalties**

**Failure to furnish TIN.** If you fail to furnish your
correct TIN to a requester, you are subject to a
penalty of $50 for each such failure unless your
failure is due to reasonable cause and not to
willful neglect.

**Civil penalty for false information with respect
to withholding.** If you make a false statement
with no reasonable basis that results in no
backup withholding, you are subject to a $500
penalty.

**Criminal penalty for falsifying information.**
Willfully falsifying certifications or affirmations
may subject you to criminal penalties including
fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or
uses TINs in violation of Federal law, the
requester may be subject to civil and criminal
penalties.

Cat. No. 10231X

Form **W-9** (Rev. 1-2002)



## PERSONAL GUARANTY OF PAYMENT
### ("Guaranty")

Retailer #:   241835
Cost Center #:   137711
Station Location:   1050 WASHINGTON STREET
BRAINTREE, MA 02184

Motiva Enterprises LLC
910 Louisiana 20th Floor
Houston, TX 77002

For value received, and to induce Motiva Enterprises LLC, other affiliated companies, and any assignee or successor-in-interest (hereinafter collectively called "Company") to undertake or continue to sell goods and/or lease property or enter into other transactions with LAKEVIEW AUTO CARE INC / LAKEVIEW AUTO CARE INC (hereinafter called the "Debtor"), the undersigned (hereinafter called the "Surety") hereby unconditionally and absolutely agrees to make payment directly to Company when due of any and all present and future indebtedness and liabilities owed to Company by the Debtor and hereby agrees to pay such indebtedness punctually.

The Surety expressly waives notice of acceptance of Guaranty, demands, notices of non-payment and any right to require Company to first proceed against the Debtor or exhaust any security held from Debtor or pursue any other remedy in its power whatsoever, and consents to any renewals or extensions of time of payment of all or any of the indebtedness hereby guaranteed.

Surety also hereby waives any claim, right or remedy which Surety may now have or hereafter acquire against the Debtor that arises hereunder and/or from the performance by the Surety hereunder, including without limitation, any claim, right or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of Company against the Debtor or any security which Company now has or hereafter acquires whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

Surety's liability to Company hereunder shall continue and remain in full force and effect in the event that all or part of the obligation guaranteed herein is recovered from Company pursuant to a claim of preference or fraudulent transfer under applicable federal or state law.

Company may at any time and from time to time without notice to or consent of the Surety and without impairing or releasing the obligations of the Surety hereunder: (1) Make any change in the terms of any obligation or liability of the Debtor to Company, (2) take or fail to take any action of any kind in respect of any security for any obligation or liability of the Debtor to Company, (3) exercise or refrain from exercising any rights against the Debtor or others, or (4) compromise or subordinate any obligation or liability of the Debtor to Company including any security therefor. Any other Suretyship defenses are hereby waived by the Surety.

This Guaranty is unlimited as to the amount and time, but may be revoked by the Surety effective five days after receipt by Company of written notice to that effect, signed by the Surety and either hand delivered or sent by certified U.S. mail to Company at the above address, marked for the attention of the Credit Manager. Such revocation shall not affect any of Surety's obligations under this Guaranty that are existing at the time Company receives notice of revocation, whether such obligations are direct or indirect, absolute or contingent, due or to become due. Additionally, Surety agrees that in the event of the death of the Surety, such Surety's heirs, executors, and administrators shall be bound hereby until actual knowledge of Surety's death shall come to the attention of the Credit Manager.

- 1 -

Rev 2002/03/01 (Ret082)
Personal Guaranty

The Surety shall not assign this Guaranty without the consent of Company and any attempted assignment without said consent shall be void. Furthermore, Surety agrees to immediately notify Company if there is a material change in Surety's financial structure or condition.

The Surety will indemnify Company for attorneys' fees, court costs, and other expenses incurred in enforcing this Guaranty. Any sums at anytime owing from Company to Surety may, at Company's option and without prejudice to any of its other rights and remedies, be applied to payment of the indebtedness that is the subject of this Guaranty.

Any provision of this Guaranty that shall be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition of unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

If this Guaranty is executed by two or more parties, "Surety" always means all of those parties jointly and severally; and this Guaranty shall be binding on each upon such party's execution hereof, whether or not this Guaranty is then or ever executed by the others. Company may sue, settle with or release (wholly or partly) one or more of the Surety-parties without releasing or otherwise affecting the obligations of the other Surety-parties hereunder.

This Guaranty constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between Surety and Company with respect to the subject matter hereof. Neither Guaranty nor any of the terms hereof may be terminated, amended, supplemented, waived or modified, except by an instrument in writing signed by the party against which the enforcement of this termination, amendment or supplement, waiver or modification shall be sought.

WITNESS MY HAND AND SEAL THIS _8th_ DAY OF _May_____, 20_05_.

NOTARIZED: _____Dorothy Rose Jamieson_____    DOROTHY ROSE JAMIESON, Notary Public
                                              My Commission Expires August 8, 2008

(NOTARY SEAL)

Surety: _____MATTHEW D. HERMAN_____
        Print Complete Individual Name

By: _____[signature]_____
    Authorized Signature

Address: _101 Colonial Hunt Drive_
         _Abington MA  02351_

Rev 2002/03/01 (Ret082)
Personal Guaranty